Argued December 8, 1909, decided January 11, 1910.

## FRANCIS v. MUTUAL LIFE INS. CO.

[106 Pac. 323.]

EVIDENCE—LIFE INSURANCE—MOTION FOR NONSUIT—ERROR IN GRANTING.
1. Evidence in an action on a life insurance policy examined and *held* sufficient to justify the court in submitting the case to the jury.

INSURANCE — LIFE INSURANCE — APPLICATION — MISREPRESENTATIONS—
BURDEN OF PROOF.
2. Where the application provided that, before the policy would become effective, the matters stated in the application must be true, the burden of proving the falsity of the representations was on insurer.

INSURANCE—LIFE INSURANCE—PAYMENT OF PREMIUM. .
3. The giving of a note by applicant, payable at insurer's office at a certain time, much later than that at which a policy would be issued in the ordinary course of business, was, unexplained, evidence of payment of the first premium; it appearing that insurer's solicitor agreed to accept it as payment.

EVIDENCE—JUDICIAL NOTICE—LIFE INSURANCE—DELIVERY OF POLICY.
4. Judicial notice is taken of the custom of life insurance companies of forwarding a policy on its final approval and execution to some agent in the vicinity of applicant's residence for delivery to him.

INSURANCE—LIFE INSURANCE—POLICY—DATE OF ISSUANCE.
5. When a company receives an application for insurance, acts on it, signs and seals a policy complete in form, and forwards it to its agent for delivery to insured, the policy is deemed to have been issued from the date of its deposit in the mails.

INSURANCE—LIFE INSURANCE—ACCEPTANCE OF RISK—SUBMISSION TO
JURY.
6. In an action on a life policy, evidence *held* sufficient to go to the jury on the question whether defendant accepted insured as a risk, executed a policy, and sent it to the local office for delivery.

INSURANCE—LIFE INSURANCE—PAROL CONTRACT.
7. A mere solicitor for insurance may not, without authority, bind insurer by a parol contract for insurance of which insurer has no knowledge.

INSURANCE—LIFE INSURANCE—EVIDENCE.
8. In an action on a life policy, evidence that defendant's solicitor did not explain to applicant that a clause in the application, reading: "I have paid $———— to the subscribing soliciting agent, who has furnished me with a binding receipt therefor, making the insurance in force from this date, provided this application shall be approved and the policy duly signed, etc., and issued"— did not apply to applicant, was inadmissible, the blank in said clause not being filled, and there being no evidence that the binding receipt had been given.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Statement by MR. JUSTICE MCBRIDE.

This is an action brought by Mary C. Francis against

the Mutual Life Insurance Company of New York, to recover on an alleged contract of insurance.

The complaint alleges: That on June 27, 1906, the defendant, in consideration of the annual payment to it, by one Richard W. Francis, of the sum of $131.35, made its policy of insurance in writing, by which it insured the life of said Francis in the sum of $5,000. That said Francis, on the 27th day of June, 1906, paid the first annual premium on said life insurance policy, by giving to the duly authorized agent of said company his promissory note for the sum of $131.35, due in six months from said 27th day of June. That defendant accepted said note as and for the payment of said first annual premium. That it was then and there agreed, between said Francis and defendant, that said insurance should be binding and in full force and effect on the defendant from the time of the reception of said premium note, and upon his passing a satisfactory medical examination, and the said defendant then and there, in consideration of the premises, agreed to execute and deliver to said Richard W. Francis, in a reasonable time, an insurance policy in the usual form of policies issued by said company. That said Francis was duly examined by a medical examiner appointed by defendant, and passed such examination, and was accepted as a risk by said defendant, and defendant thereupon issued an insurance policy in the city of New York and forwarded the same to the office of the defendant in Seattle, Washington, to be delivered to said Richard W. Francis. That before said Francis had received said policy he died, on the 26th day of July, 1906, and said policy was thereupon recalled by defendant from its office in Seattle, Washington, and is now in the possession of defendant. The plaintiff is the sole beneficiary under said policy.

Defendant, in its answer, denied the making of the policy of insurance or the payment by note or otherwise

of the first annual premium; denied the alleged agreement for temporary insurance pending the issuance of the policy, or that Francis was ever accepted as a risk by defendant; denied that it ever issued or forwarded to Seattle any policy on the life of· said Francis, except as further stated in the answer, or that there ever was any insurance in force upon the life of Francis. In a further answer, defendant alleged: That, at the date set forth in the complaint, said Francis made a written application, through a soliciting agent of defendant, for a life insurance policy; that the method of securing said insurance was well known to Francis, which method is set forth in detail in the answer. It is further set forth that the soliciting agent had no authority to waive any of the requirements of defendant in regard to contracts of insurance, and recites certain false statements alleged to have been made by Francis in regard to his habits respecting the use of intoxicating liquors.

The answer, which is of great length, fully puts in issue the right of plaintiff to recover in this action. It is also alleged, among other matters, that the policy made out and signed by the defendant and afterwards forwarded to its agent at Seattle was not forwarded for the purpose of delivery, but to be held there pending further investigation by defendant of the habits of Francis in regard to the use of intoxicants, with the intent that, if the investigation should prove favorable to Francis, the policy might be delivered to him upon his payment of the first annual premium, and that the defendant had not, at the time of the death of Francis, approved his application for insurance nor been willing to do so.

The reply puts in issue the new matter in the answer. On the trial, the defendant had a nonsuit, and plaintiff appeals. Other facts necessary to a decision of this case appear in the opinion.                REVERSED.

For appellant there was a brief over the names of
*Mr. Miller Murdoch, Mr. J. W. Bell,* and *Mr. John Man-
ning* with an oral argument by *Mr. Murdoch.*

For respondent there was a brief over the names of
*Messrs. Bronaugh & Bronaugh* with an oral argument
by *Mr. Jerry E. Bronaugh.*

MR. JUSTICE MCBRIDE delivered the opinion of the
court.

1. A nonsuit is predicated upon the assumption that
there is no reasonable theory consistent with which the
evidence introduced by the plaintiff will support a ver-
dict in her favor. We will now consider the evidence
introduced by plaintiff on the trial, in order to ascertain
whether, viewed in any reasonable light, it would have
justified a verdict had the court seen fit to submit it to
the jury.

There was evidence tending to show: That Richard
W. Francis, the deceased, on the 27th day of June, signed
an application for insurance at the instance of a solicitor
for the defendant company; that he passed a medical
examination, conducted by a medical examiner of defend-
ant; that he gave to the solicitor a promissory note, pay-
able to his own order and by him indorsed, payable at the
office of the defendant on the 15th of the ensuing Novem-
ber, which note was for the exact amount of the premium.
The note was absolute on its face, and negotiable, and not
burdened with any of the conditions customary in what
are usually termed "premium notes." The evidence
tended to show that the note was at some time forwarded
to the defendant, but whether retained in the office of its
agent in Seattle, or in the head office in New York, does
not appear, though an offer to return it was made through
the office at Seattle after the death of Francis. It further
appears that a policy in regular form, signed and sealed
by the company, was made out and forwarded to the

general office at Seattle a few days before the death of Francis, and was in said office at the time of his death.

The application, which was upon a blank of defendant company, is as follows:

. "This application made to the Mutual Life Insurance Company of New York is the basis and a part of a proposed contract for insurance, subject to the charter of the company and the laws of the state of New York. I hereby agree that all the following statements and answers, and all those that I make to the company's medical examiner, in continuation of this application, are by me warranted to be true, and are offered to the company as a consideration of the contract, which I hereby agree to accept, and which shall not take effect until the first premium shall have been paid, during my continuance in good health, and the policy shall have been signed by the secretary of the company and issued. I further agree that in any distribution of surplus, the principles and methods which may then be in use by the company shall be and are hereby ratified and accepted by me and for every person who shall have or claim any interest in the contract.

"1. My full name is *Richard W. Francis.*

"2. I reside at *six miles south of Prosser.* In the city of_____. County of *Benton.* State of *Washington.*

"2a. I do not contemplate going to any foreign country except *no.*

"3. My former residences were *Grass Valley, Oregon.*

"4. My place of business is *Benton Co., Wn.*

"5. My P. O. address is *Prosser, Wn.*

"6. My present occupation is *wheat growing,* in the following branch of business or trade,_____.

"7. My other occupations are *none.*

"8. My former occupations have been *same since childhood.*

"9. The full name of the person to whom the insurance is payable is *Mary Cordelia Francis if living, if not, to my estate.*

"10. Residing *with me.*

"11. The relationship of said beneficiary to me is *that of wife.*

"12. The insurable interest of the said beneficiary in the life proposed for insurance, other than that of family relationship, is_____.

"13. I hereby apply for insurance on my life on the *income life* plan *life* years' payment *20* year distribution.

"14. Amount, 5,000.

"15. The premiums are to be paid................annually.

"16. I was born on the *24th* day of *October, 1873,* in *Montgomery, North Wales.*

"17. I am a citizen or subject of *the United States.*

"18. I have been accepted for insurance under the following policies in this company: *None.*

"19. I am insured in other companies and associations, as follows: *1000 Mass. Mutual,* and in no others.

"20. I have never made an application for life insurance to any company or association upon which a policy has not been issued on the plan and premium rate originally applied for, except to the following companies or associations: *None,* and no such application is now pending or awaiting decision.

"I hereby warrant and agree that during the next two years following the date of issue of the contract of insurance for which application is hereby made, I will not engage in any of the following extra hazardous occupations or employments: Retailing intoxicating liquors, handling electric wires and dynamos, blasting, mining, submarine labor, aeronautic ascensions, the manufacture of highly explosive substances, service upon any railroad train or track or in switching or in coupling cars, or on any steam or other vessel, unless written permission is expressly granted by the company.

"I also warrant and agree that I will not die by my own act, whether sane or insane, during the period of one year next following said date of issue.

"I have paid $................ to the subscribing soliciting agent, who has furnished me with a binding receipt therefor, signed by the secretary of the company, making the insurance in force from this date, provided this application shall be approved, and the policy duly signed by the secretary at the head office of the company and issued.

"Dated at *Prosser, Wn., June 27th, 1906.*

"[Signature of person whose life is proposed for insurance]

*"Richard W. Francis.*

"I have known the above named applicant for *one day* and saw him sign this application. I have issued him binding receipt No. ................

"A. C. Trebur, Soliciting Agent."

On the opposite side of the application is the report of the medical examiner at Prosser, Washington, where the application was made, containing answers to the usual printed questions propounded to applicants for insurance, all of which would seem, if true, to indicate that the applicant was a very good risk; also a certificate of the medical examiner, to his own physical examination, at the conclusion of which he recommends the applicant for insurance without reserve.

From an inspection of the various dates, stamped on the application, it appears probable that it was received at the Seattle office about July 3d, and by the New York office July 9th. The policy, having been recalled before the deceased or his beneficiary received it, was not in evidence; but it was admitted that it had been forwarded to the Seattle office before the death of deceased and was actually there when he died, which was from an injury received while working on a threshing machine.

On cross-examination of Dr. Angus, who was defendant's medical examiner, but who was called as a witness for plaintiff, defendant's counsel called his attention to the following correspondence, which was had between the doctor and defendant's medical referee, afterwards introducing the letter in testimony. The letter and all of the reply thereto, except those portions inclosed in brackets, were evidently written in the company's office, and both are on the same sheet of paper, reading thus:

"The Mutual Life Insurance Company of New York.
"Richard A. McCurdy, President.

"Seattle, Wash., July 23, 1906.
"Dr. D. M. Angus, Prosser, Washington—Dear Doctor: The company has reason to believe that Robert W. Francis, whom you examined recently, drinks to excess at times. Inasmuch as you have known applicant two or three years, will you kindly say in confidence what you know concerning his habits in the use of alcohol? Please insert replies to questions asked below.
"Yours very truly,
              °          "Nevin D. Pontius,
                              "Medical Referee."

"[July 24, '06.]

"Dr. Nevin D. Pontius, Seattle, Washington—Dear Sir: Referring to examination of Robert W. Francis:

"What in your opinion is the average number of drinks taken daily?

"[Some days none, other days several.]

"Does applicant drink to a state of intoxication? If so, how frequently, and date of last occurrence?

"[Have known him twice to be loaded but never drunk. Upon inquiry I find concensus of opinion that he was a drinker.]

"[July 25, '06.]

"[R. W. Francis was killed by threshing machine today.] Yours very truly,

"[D. W. Angus, M. D.]

"Please do not detach."

On July 31, 1906, the company, by its general manager at Seattle, addressed a letter to deceased at his postoffice address at Prosser, Washington, informing him that his application for insurance had been declined, and that his promissory note was being returned.

We are of the opinion that the evidence of which the foregoing is a summary, was sufficient to justify the court in submitting the case to the jury, and that upon these facts, if uncontradicted and unexplained, a verdict for the plaintiff, if rendered, should have been allowed to stand. By the terms of the application, the following conditions were to concur before a policy would become effective: First, the matters stated in the application were to be true; second, the first premium must have been paid during the good health of the applicant; and third, the policy must have been signed by the company and issued.

2. Upon the first of these conditions, the burden of proof was upon the defendant to prove the falsity of the representation. The questions, which an applicant for insurance is required to answer, are so numerous, covering, as they do, inquiries concerning his age, health, habits, and even the age and health of his ancestors, that

to require the beneficiary in the first instance to take the affirmative and prove each of these to be true would be an intolerable burden, while if the insurer knows, or has reason to believe, that any one of the representations made by the deceased was untrue, it is only fair that it should be required to furnish proof of such falsity. *Piedmont & Arlington Life Insurance Co.* v. *Ewing,* 92 U. S. 377 (23 L. Ed. 610.) The wife of the deceased also testified, in effect, that the deceased did not use intoxicants to excess, but took a drink occasionally, so that, so far as the habits of the deceased were in issue, there was affirmative evidence that they were unimpeachable.

3. As to the second requirement for a valid policy, namely, the payment of the first premium, we think that the giving of the note by deceased, unexplained by any testimony on the part of defendant, was evidence of such payment. It was payable at a certain time six months distant, and probably at a date much later than that upon which a policy would be issued in the ordinary course of business. The note was payable at the defendant's office and was negotiable. Had defendant so desired, it could have sold the note immediately. The application furnished by defendant indicates that its agent and solicitor had authority to receive payments and the testimony of Mrs. Francis is to the effect that the agent soliciting the insurance agreed to accept it as payment. May, Insurance, § 134; Richard, Insurance, § 93; *Kilborn* v. *Prudential Insurance Co.,* 99 Minn. 176 (108 N. W. 861) ; *Mutual Life Insurance Co.* v. *Logan,* 87 Fed. 637 (31 C. C. A. 172.)

As to the third requirement necessary to authorize a recovery, namely, that a policy signed by the secretary should be issued, we think that there was sufficient evidence to have justified the court in submitting this question to the jury. It was conceded on the trial that a policy, regular in form, was actually signed by the company

and sent by mail to its office in Seattle. In the absence of evidence of any other motive, the natural inference from this act would be that it was sent there for the purpose of being delivered to the deceased. The operations of these great insurance companies have become such a part of our business life that judicial notice should be taken of the custom, generally in vogue among them, of forwarding a policy upon its final approval and execution to some agent in the vicinity of the residence of the applicant, for delivery to him. *Miller* v. *Northwestern Mutual Life Ins. Co.,* 111 Fed. 465 (49 C. C. A. 330.) It may be true that it is not always sent for that purpose, but such is so obviously the custom and intent in a great majority of cases that it would be but a fair inference, in the absence of evidence of some other intent or instruction, that a policy forwarded to the local agent was intended for delivery.

5. Where a company receives an application for insurance, acts upon it, signs and seals a policy, complete in form, and forwards it to its agent for delivery to the person insured, the policy is deemed to have been issued from the date of its deposit in the mails. *Wagner* v. *Supreme Lodge Knights and Ladies of Honor,* 128 Mich. 660 (87 N. W. 905) ; *Kilborn* v. *Prudential Insurance Co.,* 99 Minn. 176 (108 N. W. 862) ; *Yonge* v. *Equitable Life Assur. Soc.* (C. C.) 30 Fed. 902; *Hallock* v. *Com. Ins. Co.,* 26 N. J. Law, 268; *Tayloe* v. *Mer. Ins. Co.,* 9 How. 390 (13 L. Ed. 187.)

6. Upon the argument, and also in respondent's brief, it is claimed that the policy was not forwarded for the purpose of delivery, but to be held by the Seattle office pending investigation into the habits of deceased in regard to the use of intoxicants. But there was not a particle of evidence to show this to have been the case, certainly not any introduced by plaintiff. The correspondence between the medical referee in the Seattle office and the local examiner at Prosser only tended to show that correspondence

Sig. 10

on that subject had actually occurred between these gen-
tlemen, not that such investigation was in the contempla-
tion of the head office or was directed by it when the
policy was mailed.  For such purpose it would have been
worthless as a purely self-serving document.  This corre-
spondence itself is not free from the suspicion of having
been fabricated after the death of Francis.  Angus testi-
fied that he received the letter from Pontius about the
date it bore, in due course of mail.  His answer, dated on
the 24th, two days before Francis died, "The concensus
of opinion is he was a drinker," sounds very much as if it
had been written after, instead of before, the occurrence.
We do not usually speak of our living acquaintances in
the past tense.  The natural reply to the question asked
would have been, "He is a drinker."  The postscript,
dated on the 25th of July, informs Pontius that Francis
was killed that day, when in fact he was alive and well
and was not killed until the next day.  These discrep-
ancies are quite as consistent with the theory that the
document was prepared after the death of Francis had
become known to the Seattle office, and with the intent to
fabricate a defense, as they are with the theory that the
letters were written in the usual course of business.  Their
introduction tended, if anything, to strengthen plaintiff's
contention that the policy had been sent for the purpose
of delivery, and that defendant's representatives in Seat-
tle, hearing of the death of Francis, were trying to fabri-
cate a defense to an expected action upon the policy.  The
envelopes in which these letters were transmitted, with
the postmarks showing the date of mailing and reception
would have helped wonderfully in clearing up the suspi-
cious atmosphere that surrounds this correspondence, but
they were not introduced.  In our opinion there was evi-
dence that the company had accepted deceased as a risk,
had executed a policy, and sent it to their Seattle office for
delivery, and that the premium had been paid by the note

given by deceased. Such evidence might not convince every one, but it was such as ought to have gone to the jury. It was sufficient to put defendant upon proof.

7. We do not think the court erred in excluding testimony offered by plaintiff tending to show an oral contract of insurance pending the issuance of the policy. The transaction between deceased and the agent, resulting in the making and forwarding the application to the company's head office, was not a contract of insurance, nor was there any evidence of the agent's authority to insure in any case beyond the fact that in certain cases he could issue what is called a "binding receipt," which we shall hereafter notice. The offer was not to the agent, but to the company; to be forwarded to it and passed upon and accepted or rejected by it, and contemplated a policy to be issued by it. Without satisfactory evidence of the soliciting agent's authority to make such a contract, it would be a dangerous precedent to hold that a mere solicitor for insurance could bind his company to pay a $5,000 loss, by a contract resting purely in parol and of which it could have no knowledge.

The cases cited by counsel for plaintiff are cases arising out of claims for fire insurance, where, by custom, local agents are permitted to issue temporary policies and assume temporary risks, even without policies. No well-considered case can be found where the same rule has been applied to life insurance. The deceased had a right to assume that the soliciting agent he dealt with had authority to take and forward his application, to receive and forward his first premium, and to stipulate for the time and manner in which it should be paid, but had no right to assume that he could insure beyond the extent of giving the so-called "binding receipt" mentioned in the application.

8. There was no error in the refusal of the court to allow the plaintiff to show that the solicitor did not ex-

plain to deceased that the last clause in the application did not apply to him. The clause is as follows: "I have paid $———— to the subscribing soliciting agent, who has furnished me with a binding receipt therefor, signed by the secretary of the company, making the insurance in force from this date, provided this application shall be approved and the policy duly signed by the secretary at the head office of the company and issued." The blank indicated above had never been filled, and there was no evidence that the "binding receipt" had ever been given. If such a receipt had been given, it is difficult to see how it would have strengthened plaintiff's case, since it would only have become effective upon the application being approved and a policy issued thereon. And in such a case, as already shown, the policy itself would effect the insurance. The clause seems to be a mere trick on the part of the insurance companay to deceive the applicants into the belief that they have temporary insurance, and thereby induce them to part with their money in advance of the issuance of the policy. It is a practice unworthy of a great business corporation, and is commented upon by Rudkin, J., in *Starr* v. *Mutual Life Ins. Co.*, 41 Wash. 228 (83 Pac. 117) in terms none too severe.

The judgment of the lower court is reversed, and a new trial ordered.                                    REVERSED.